UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| LOREN A. DEAN,<br><br>    Plaintiff,<br><br>  v.<br><br>INTERNAL REVENUE SERVICE,<br><br>    Defendant. | Case No. C05-5352FDB<br><br>ORDER GRANTING UNITED STATES' MOTION FOR SUMMARY JUDGMENT |

## INTRODUCTION

Defendant IRS moves for summary judgment on Loren Dean's claim for refund for 1996 as a result of the carryback of his 20% partnership share of Dean Securities' loss for 1998. The IRS argues that the loss carryback should be disallowed because of either the "passive loss" limitations of Section 469 or the "capital Loss" limitations of Sections1211, and 1212. Additionally, the IRS argues that Dean Securities' loss for 1998 was a result of its activities as a "trader" of stocks and bonds.

Under the Internal Revenue Code, passive activity losses are generally only deductible to the extent of passive activity gains. 26 U.S.C. §§ 469(a)(d). If no passive gains exist to offset the loss, the taxpayer may carry the passive loss forward to the next year. 26 U.S. C. § 469(b). A passive activity is any activity, involving a trade or business, in which the taxpayer does not materially

ORDER - 1

participate. 26 U.S.C. § 469(c). Material participation is an activity that is regular, continuous, and substantial, and exists for a given tax year when:

1. the individual participates in the activity for more than 500 hours;

2. the individual's participation constitutes substantially all of the activity by all individuals;

3. The individual participates in the activity for more than 100 hours and such individual's participation is not less than any other individual;

4. The activity is significant and the aggregate participation of the individual in significant activities exceeds 500 hours;

5. The individual materially participated in the activity for any five years within the last ten years;

6. The activity is a personal service activity and the individual materially participated for any three years; or

7. The individual is deemed to have materially participated based upon the facts and circumstances.

26 U.S.C. § 469(h); Treas. Reg. § 1.469-5T.

Regarding securities that are bought and sold, there are three classifications pertinent for tax purposes: <u>dealer</u>, <u>trader</u> or <u>investor</u>. *United States v. Wood*, 943 F.2d 1048, 1051 (9th Cir. 1991)(*relying upon King v. Commissioner*, 89 T.C. 445, 457-58 (1987). Only dealers who hold securities primarily for sale to customers in the ordinary course of business may deduct losses from such sales against ordinary income; traders and investors, on the other hand, must treat these securities as capital assets that are subject to the capital loss limitations under Sections 1211 and 1212. A dealer is differentiated from a trader in that his "income is based on the service he provides in the chain of distribution of the goods he buys and resells, rather than on fluctuations in the market value of those goods, while the trader's income is based not on any service he provides but rather on, precisely, fluctuations in the market value of the securities or other assets that he transacts in." *Biefeldt v. C.I.R.*, 231 F.3d 1035, 1037 (7th Cir. 2000). Thus, a trader is someone who purchases

ORDER - 2

and sells securities with the intent of making profits from a security's price fluctuations. *Id.*; *see also Wood*, 943-F.2d at 1051-52.

Plaintiff Loren Dean describes the family-run partnership, Dean Securities as having three general partners from 1997 – 2001: Randy Dean, Chuck Dean, and Loren Dean. Loren asserts that the area that he managed in ths business was "legal matters" that arose from unhappy customers and disputes with the brokers as well as "financial matters." Loren Dean stated in his deposition:

> I think '98 was still a pretty good year for getting to the office, and that would have – and if that recollection, which is my best recollection, is right, then that should be well over 500 hours, I mean, just doing the math in my head.

(L. Dean Dep., p. 30, ll 14-18, Ex. A to Ham Decl.; p. 4 Defendant's Response.) Loren's brother Randy states in his declaration that, "It is my recollection that Loren Dean spent more than 500 hours in the Dean Securities office," and he also recalled that Loren worked additional hours at his home. (Decl. of Randy Dean, p. 2.)

Loren Dean also contends that "Dean Securities invested in both bonds and stocks for resale to clients." (Dean Dep. p. 62.) Loren Dean argues that in *Bielfeldt*, the Seventh Circuit recognized that "[a]lthough one thinks of a dealer's inventory or stock in trade as made up of physical assets, it can be made up of securities instead. A stockbroker who owned shares that he sold to his customers at market price plus a commission would be a bona fide dealer." 231 F.3d at 1037.

Loren Dean argues that, at a minium, there are genuine issues of material fact on the United States' passive loss and capital loss claims.

**DISCUSSION**

Summary judgment is proper if the moving party establishes that there are no genuine issues of material fact and it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). If the moving party shows that there are no genuine issues of material fact, the non-moving party must go beyond the pleadings and designate facts showing an issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317,

ORDER - 3

322-323 (1986).  Inferences drawn from the facts are viewed in favor of the non-moving party.  *T.W. Elec. Service v. Pacific Elec. Contractors,* 809 F.2d 626, 630-31 (9th Cir. 1987).

Failure of proof as to any essential element of plaintiff's claims means that no genuine issue of material fact can exist and summary judgment is mandated.  *Celotex*, 477 U.S. 317, 322-23 (1986).  The nonmoving party "must do more than show there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

### *Passive Loss Limitation:  Material Participation of Loren Dean*

Loren Dean responds to questions about his work at Dean Securities during 1998 and a span of years encompassing that year.  Responding to a question about whether he worked at Dean Securities 1979 through 2003, he answered, "More or less, yeah."  (L. Dean Decl. p. 13.)  Asked how many employees Dean Securities had in the mid-1990s, Loren Dean responded: "Well, I can't tell you accurately, but, you know, just a few, you know, four.  I mean, that's a bit of a guess, but, I mean, that's the scale of it."  ( *Id.* p. 15.)  Dean Securities became a limited liability company in 2001 ( *Id.* p. 26) and ceased operations in 2003.  ( *Id.* p. 17.)

Loren Dean indicated that in 1998 he would go into the office on an irregular basis, but he didn't really recall.  ( *Id.* 27.)  When asked what he mean by "irregular," he responded, "well over time I went less and less."  ( *Id.* )  While Loren Dean stated at one point that his best recollection was that he worked over 500 hours, but when asked how sure he was of this, Dean responded "Oh, not, not very sure. Q. So you're not very sure if you worked more than 500 hours or not, then? A. Not very sure."  ( *Id.* p. 30.)  Loren Dean agreed that between 1995 to 2003 he spent more time working at home, and the overall amount of work in general that he did declined between those years.  ( *Id.* pp. 31-32.)  From 1997 through 2003, the most active partners were his brothers Randy and Geoff (their father died in 1996).  ( *Id.* p. 35.)  While Loren's brother Randy makes a statement in his declaration that "It is my recollection that Loren Dean spent more than 500 hours in the Dean Securities office," Randy Dean's Declaration is not dispositive on this issue of Loren Dean's

ORDER - 4

1   participation at Dean Securities.  Randy merely has a recollection that is very helpful to Loren, but

2   no specific facts to back it up.   The evidence presented is insufficient to sustain a conclusion that

3   Loren Dean has rebutted the United States' showing on the element of material participation with

4   respect to Dean Securities.  The United States, therefore, is entitled to summary judgment on it's

5   claim regarding "passive loss" limitations under Section 469.

### *Capital Loss Limitation:  Trader or Dealer*

During his deposition, Loren Dean explained how Dean Securities generated profits:

> **Q. How did your partnership make money?**
>
> A. Well, we would – If a client bought something on, say, the New York Stock Exchange, we would be their agent and we would charge a commission.  And then for some things, especially things that aren't traded on an exchange, which is prominently bonds, we would maintain an inventory and buy from kind of a wholesale broker and then retail it essentially to clients, and so there would be a markup involved.
>
> ***
>
> **Q. Would it be mostly from the commissions or from the bonds?**
>
> A. It would – well, it could vary.  If you maintain an inventory, you could also make or lose money based on changes in the prices of the inventory, and you know, you buy it to sell it to clients, say, but it goes up in the meantime or goes down in the meantime.  You have to mark up from the market price.  So you could also make or lose money that way, and that gets dumped in with our trading profits or losses.  So whether we would make more money from commissions or more money from trading would vary.

(Loren Dean Decl. p. 61-62.)

In *Bielfeldt v. C.I.R.*, 231 F.3d 1035, 1037 (7th Cir. 2000), the Court presented a thorough discussion of the distinction between a dealer and a trader:

> ... the dealer's income is based on the service he provides in the chain of distribution of goods he buys and resells, rather than on fluctuations in the market value of those goods, while the trader's income is based not on any service he provides but rather on, precisely, fluctuations in the market value of the securities or other assets that he transacts in.

The Court went on to explain, however, that "[a] stockbroker who owned shares that he sold to his customers at market price plus a commission would be a bona fide dealer." *Id.*  While Bielfeldt argued that he was providing a market service – he would buy Treasury securities at depressed prices

ORDER - 5

when there was a temporary glut and hold the securities off the market until the price rose, when he would sell – thus bringing up the price of the securities and decreasing the interest on the national debt.  The Court concluded that Bielfeldt was simply describing the social benefit of speculation and that he was a speculator period and not a dealer.

In *Marrin v. C.I.R.*, 147 F.3d 147 (2nd Cir. 1998), the Court examined a claim under Section 1221(2) that property is not a capital asset if it is:

> stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade of business[.]

In Marrin's case, the Second Circuit held that Marrin was properly categorized as a trader and not a dealer who was entitled to claim ordinary loss treatment for his securities transactions. *Id.* at 151. The Court referred to a Ninth Circuit case, which explained:

> A dealer is a person who purchases the securities or commodities with the expectation of realizing a profit "not because of a rise in value ... but merely because they have or hope to find a market of buyers who will purchase from them at a price in excess of their cost.  This excess or mark-up represents remuneration for their labors as a middle man bringing together buyer and seller, ...."  Dealers have customers for purposes of section 1221.

*United States v. Wood*, 943 F.2d 1048, 1051 (9th Cir. 1991).  Thus, as to Marrin, the Court concluded that he traded on his own behalf, all of his trades were for his own account, and all were made through registered broker-dealers. *Id.* at 149.  Furthermore, while Marrin spent upwards of 40 hours at home each week researching trades and devising trading strategies, he was not licensed as a securities dealer, did not advertise himself as a securities dealer, and did not have an established place of business for conducting securities transactions. *Id.* at 149.

What is not clear from the cases and the United States argument is this: is there a difference in reselling the security to a customer for a mark-up over the firm's initial cost of purchasing the security and reselling the security to a customer for a mark-up over market price at the time?   Also,

ORDER - 6

1  it is not clear that there was trading of securities without selling to a customer that also contributed
2  to the losses in question.
3        In Loren Dean's case, Dean Securities did have a place of business and sold securities on
4  commission.  Dean Securities also maintained an inventory that was "prominently bonds" (Loren
5  Dean Decl. p. 61.) that would be retailed to clients on a mark up from the market price.  The United
6  States argues that Dean Securities, however, made money on the fluctuation in market price of the
7  securities it held in its trading account in addition to the mark-up.  Loren Dean was asked about from
8  which the company received the most income the commissions or from the bonds, and he responded
9  as follows:

> It would – well, it could vary.  If you maintain an inventory, you could also make or lose money based on changes in the prices of the inventory, and, you know, you buy it to sell it to clients, say, but it goes up in the meantime or goes down in the meantime.  You have to mark up from the market price.  So you could also make or lose money that way, and that gets dumped in with our trading profits or losses.  So whether we would make more money from commissions or more money from trading would vary.

14  Loren Dean Decl. p. 62.  Loren Dean also stated that the 1998 loss of about a million dollars
15  occurred in "The trading accounts," *Id.* p. 69, made up of some stocks, but mostly bonds, and that
16  the losses were trading losses, but "It can include markups and markdowns to inventory."  *Id.* p. 70.
17  Then Loren Dean was asked:

> Q.  But, again, those are trading losses?
>
> A.  Yes.
>
> Q.  So most of the loss from 1998 came from a situation where the partnership bought either a stock or a bond at one price and then later sold it to its clients at a lower price; is that correct?
>
> A.  That's basically correct.  I – I think Randy did some short selling as well.

23  *Id.* p. 70.  Then Loren Dean was asked:

> Q.  Do you think that all of the million dollars came from trading losses?
>
> A.  It's a likelihood.

26  ORDER - 7

1  Q. So these losses weren't generated by the expenses, the operating expenses of the firm, the employee salaries, utilities, whatever rent the firm may have had to pay. But it came, again, from these trading losses?

A. The lion's share of them were trading; at least the lion's share were trading losses.

Q. Eighty percent, 90 percent came from –

A. Yeah, plausibly.

Q. Plausibly 90 percent?

A. Yeah.

*Id.* p. 71.

Under the circumstances, the Court cannot grant summary judgment to the United States with respect to the capital loss limitations under Sections 1211 and 1212. It is not clear whether a customer was involved all the time when a security was sold.

## CONCLUSION

The United States is entitled to summary judgment on the passive loss limitations of Section 469, but it is not entitled to summary judgment on the capital loss limitations of Sections 1211 and 1212. The Plaintiff's claim for refund of 1996, therefore, is disallowed.

NOW, THEREFORE, IT IS ORDERED: The United States' Motion for Summary Judgment [Dkt. # 32] is GRANTED.

DATED this 7th day of February, 2007.

FRANKLIN D. BURGESS
UNITED STATES DISTRICT JUDGE

ORDER - 8